**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JOHN R. HAYES, III,        )
                                  )
                Petitioner,   )
                                  )
               v.          )        1:16CV1100
                                  )
MARK CARVER,           )
                                  )
                Respondent.   )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) Respondent has moved to dismiss the Petition on grounds of untimeliness. (Docket Entries 6, 7.) For the reasons that follow, the Court should dismiss the Petition as untimely.

## I. Procedural History

On July 19, 1994, in the Superior Court of Forsyth County, a jury found Petitioner guilty of two counts of second degree murder in cases 93 CRS 36994 and 36995. (See Docket Entry 1, ¶¶ 1, 2, 4-6; Docket Entry 7-4 at 2-3.)[1] The trial court sentenced Petitioner to two consecutive life sentences. (See Docket Entry 1, ¶ 3; Docket Entry 7-5 at 2-3, 6-7.)

Petitioner appealed (see Docket Entry 1, ¶¶ 8, 9), and, on August 15, 1995, the North Carolina Court of Appeals issued an

---

[1] Throughout this document, pin citations refer to the page numbers that appear in the footer appended to documents upon their docketing in the CM/ECF system.

unpublished opinion finding no error arising from Petitioner's trial (Docket Entry 7-6 at 2-4). Petitioner did not thereafter petition the North Carolina Supreme Court for discretionary review. (See Docket Entry 1, ¶ 9(g).)

Years later, the Director of the Wake Forest University Innocence and Justice Clinic ("WFIJC"), Mark Rabil, began to investigate Petitioner's case, and assigned law students enrolled in the WFIJC to assist. (See Docket Entry 7-12 at 51-52, 55-57; Docket Entry 7-9 at 5, 16.)[2] At an unidentified point during that investigation, Petitioner allegedly first learned of a third gunshot victim, Kenneth Evans, who survived his injuries.[3] As a result of learning about Evans, on February 10, 2011, Petitioner (through Rabil as pro bono counsel) requested a copy of the police file in his case from Jennifer Martin, the chief assistant district attorney of Forsyth County. (See Docket Entry 7-10 at 4.) According to Petitioner, Martin provided Petitioner with a copy of a portion of the police file that did not include seventeen transcribed witness statements. (See id.; see also Docket Entry 7-12 at 70, 77; Docket Entry 7-13 (copies of documents from police file Martin provided to Petitioner).) On March 23, 2011, Rabil

---

[2] The date that Rabil began investigating Petitioner's case does not appear in the record. Moreover, the record does not indicate what prompted Rabil and/or the WFIJC to begin investigating Petitioner's case.

[3] The record reflects neither the date on which Petitioner first learned of Evans's status as a gunshot victim nor the means through which Petitioner discovered such information.

and two law students enrolled in the WFIJC, Christopher Jackson and Travis Talbot, interviewed Petitioner's trial attorney, Warren Sparrow (see Docket Entry 7-10 at 11), and provided Sparrow with copies of the documents produced by Martin (see Docket Entry 7-10 at 12; see also Docket Entry 7-12 at 53-68.)  According to Jackson, "Sparrow . . . could guarantee he never received a copy of the police file . . . presented to him." (Docket Entry 7-10 at 12.)

Thereafter, Petitioner's counsel requested and received from Martin a copy of a ballistics report and related documents from the State Bureau of Investigation ("SBI") reflecting its analysis of certain physical evidence in Petitioner's case. (See id. at 4; see also Docket Entry 7-12 at 77-78; Docket Entry 7-14 (copies of SBI documents Martin provided to Petitioner).)  After Petitioner's counsel mailed a copy of these additional documents to Sparrow (see Docket Entry 7-10 at 12), Sparrow left Jackson a voicemail on April 19, 2011, indicating that Sparrow "would not be reviewing the file and declined any further cooperation . . . in th[e] matter" (id.).

Between April and October, 2012, Petitioner's counsel contacted Martin on several occasions, requesting to examine the physical evidence and obtain copies of the remainder of the police file. (See Docket Entry 7-10 at 4; see also Docket Entry 7-7 at 89-90.)  On October 17, 2012, Martin sent an email to Petitioner's counsel declining his requests for further review of the evidence and police file, absent a court order for post-conviction

discovery.  (See Docket Entry 7-10 at 5; see also Docket Entry 7-12 at 81-82.)

On February 12, 2013, Petitioner, through counsel, filed a Motion to Compel Discovery in the Forsyth County Superior Court (Docket Entry 7-7), requesting "copies of the complete police files . . . includ[ing] . . . all transcribed and recorded statements made by witnesses, . . . the video tape taken of the scene; any and all photographs of the crime scene; medical records for any and all of the shooting victims; and inventories or listings of any and all property taken into possession by law enforcement officers concerning the shootings . . ., copies of the complete files of the SBI Crime Lab for any and all inspection or testing of physical evidence . . ., [and] any and all exculpatory evidence relating to th[e] case" (id. at 6).  After a hearing, the court denied that Motion, finding that the "174 pages of the police reports and [SBI] lab reports" previously provided by Martin constituted sufficient "information . . . to allow [Petitioner] to review, investigate, prepare and file a Motion for Appropriate Relief [("MAR")] and raise any potential claims for appropriate relief."  (Docket Entry 7-8 at 3.)    On March 7, 2013, Petitioner, through counsel, filed a MAR in the Forsyth County Superior Court (Docket Entry 7-9; see Docket Entry 1, ¶¶ 10, 11(a)(1)-(5).)   In that MAR, Petitioner alleged that the state failed to produce exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83

(1963), and solicited and failed to correct false testimony in violation of <u>Napue v. Illinois</u>, 360 U.S. 264 (1959). (<u>See</u> Docket Entry 7-9 at 5-11; <u>see also</u> Docket Entry 1, ¶ 11(a)(5).) Contemporaneously, Petitioner filed a second Motion to Compel Discovery with the Forsyth County Superior Court (Docket Entry 7-10), seeking the same materials from the state as the prior such motion, and adding requests for (1) "any statements made by [Petitioner's] trial attorney to any representative of the State . . ., [and] any records or notes . . . of any discovery which was provided to [Petitioner's] trial attorney and any records that [Petitioner's] trial attorney reviewed evidence in the possession of the prosecution or law enforcement" (<u>id.</u> at 7). On March 27, 2013, Forsyth County Assistant District Attorney Matthew Breeding provided additional material to Petitioner, including the transcribed statements of numerous witnesses. (<u>See</u> Docket Entry 7-11 at 3; <u>see also</u> Docket Entry 7-12 at 70-71.)

After obtaining leave of court, Petitioner filed an amended MAR ("AMAR") on August 30, 2013 (Docket Entry 7-11; <u>see also</u> Docket Entry 1, ¶ 11(a)(4), (5)), which raised the same <u>Brady</u> and <u>Napue</u> claims as the original MAR (<u>compare</u> Docket Entry 7-9, <u>with</u> Docket Entry 7-11), but added a claim for ineffective assistance of trial counsel (<u>see</u> Docket Entry 7-11 at 15-19) and additional citations to the materials produced by Breeding in March 2013 (<u>see</u> <u>id.</u> at 7-18).

The Honorable William Z. Wood held a hearing on Petitioner's AMAR on October 7 and 8, 2014 (see Docket Entry 7-12), and Petitioner called Sparrow, Jackson, and Evans as witnesses (see id. at 13-108). On November 21, 2014, Judge Wood entered an order denying all three claims in Petitioner's AMAR. (Docket Entry 7-16; see also Docket Entry 1, ¶ 11(a)(7), (8).) Petitioner, through counsel, filed a certiorari petition with the North Carolina Court of Appeals seeking review of his AMAR's denial on July 16, 2016 (Docket Entry 7-18; Docket Entry 1, ¶ 11(d)), which that court denied on August 24, 2016 (Docket Entry 7-20).

Petitioner, proceeding through counsel, filed the instant Petition on September 2, 2016. (Docket Entry 1.) Respondent moved to dismiss the Petition on grounds of untimeliness (Docket Entries 6, 7), Petitioner responded in opposition (Docket Entries 10, 11), and Respondent replied (Docket Entry 17). For the reasons that follow, the Court should grant Respondent's instant Motion, because Petitioner submitted his Petition outside of the one-year limitations period.

## II. **Facts**

On direct appeal, the North Carolina Court of Appeals summarized the trial evidence as follows:

> The State's evidence tended to show that gunshots erupted outside a "drink house" in Winston-Salem during the early morning hours of 25 July 1993. [Petitioner] and others within the building rushed outside to investigate. [Petitioner] opened the trunk of an automobile, removed a gun with a clip, and began shooting the weapon into the

6

air and into the crowd in the street.  After firing a
number of shots, he entered the vehicle and drove away,
leaving two people dead as the result of medium caliber
gunshot wounds.

(Docket Entry 7-6 at 2.)[4]

### III. **Petitioner's Claims**

The Petition raises three grounds for relief: (1) "the State
violated the Petitioner's due process rights under the 14th
Amendment to the Constitution of the United States by soliciting
and failing to correct false or misleading testimony" (Docket Entry
1 at 6 (initial capital letters omitted)); (2) "the State violated
the Petitioner's due process rights under the 14th Amendment to the
Constitution of the United States by failing to produce exculpatory
and impeaching evidence as required by [Brady] and its progeny"
(id. at 8 (initial capital letters omitted)); and (3) "the
Petitioner's convictions were obtained in violation of the Sixth
Amendment's guarantee to the effective assistance of counsel" (id.
at 9 (initial capital letters omitted)).

### IV. **Discussion**

Respondent moves to dismiss the Petition as filed outside of
the one-year limitations period, see 28 U.S.C. § 2244(d)(1).  (See
Docket Entry 7 at 8-22.)  In order to assess Respondent's statute
of limitations argument, the Court must first determine when
Petitioner's one-year period to file his Petition commenced.  The

---

[4] A witness at Petitioner's criminal trial described a drink house as a
place "where people go to drink after hours."  (Docket Entry 3 at 20.)

United States Court of Appeals for the Fourth Circuit has explained:

> Under § 2244(d)(1)(A)-(D), the one-year limitation period begins to run from the latest of several potential starting dates:
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Green v. Johnson, 515 F.3d 290, 303-04 (4th Cir. 2008). The Court must determine timeliness on claim-by-claim basis. See Pace v. DiGuglielmo, 544 U.S. 408, 416 n.6 (2005).

Respondent contends that the Petition remains untimely under subparagraph (A), because Petitioner's conviction finalized prior to the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") and, thus, Petitioner had until April 24, 1997, one year after AEDPA's effective date, to file his instant Petition.

(See Docket Entry 7 at 9-10.)[5]  Petitioner has not contested Respondent's assertion of untimeliness under subparagraph (A) (see Docket Entry 11); however, in the paragraph of the instant Petition that requests an explanation of the timeliness of the Petition, Petitioner states that "[h]e was unable to discover the facts upon which his [AMAR] (filed on 8/30/2013) was based until all of the post-conviction discovery was provided to him after filing his initial MAR (filed on 3/7/2013)" (Docket Entry 1, ¶ 18), which could represent a contention that subparagraph (D) applies in his case.

Respondent's Motion to Dismiss contends that the instant Petition remains untimely even if subparagraph (D) applies.  (See Docket Entry 7 at 10-20.)  In that regard, Respondent argues that "[t]he record makes manifest Petitioner was either aware of, or through the exercise of due diligence should have been aware of, the factual predicates of his <u>Brady</u>, <u>Napue</u>, and [ineffective assistance of trial counsel] claims on or before [April 19, 2011]" (<u>id.</u> at 10), the date on "which [Sparrow] indicated he would consider no further records and would no longer cooperate with the [WFIJC's] investigation" into Petitioner's case (<u>id.</u> at 11).  Respondent further argues that "Petitioner should have filed the instant [Petition] on or before [April 19, 2012]" (<u>id.</u>), and that

---

[5] Neither Petitioner nor Respondent argue that subparagraphs (B) or (C) apply in this situation.  (<u>See</u> Docket Entries 2, 7, 11, 17.)

Petitioner has not shown entitlement to statutory or equitable tolling (see id. at 12-20).[6]

Petitioner's response to the Motion to Dismiss does not specifically address Respondent's above-described arguments, but rather states: "[a]ssuming arguendo that the [Petition] was not filed within the limit imposed by § 2244(d)(1) for 'newly discovered evidence,' this Court should allow [Petitioner] to present his claims for false or misleading testimony, *Brady* violations, and ineffective assistance of counsel under the 'actual innocence' gateway." (Docket Entry 11 at 2 (emphasis added); see also id. at 6-7 (contending that "[n]ew reliable evidence of actual innocence creates a gateway for a habeas petitioner to present procedurally defaulted constitutional claims by allowing an exception to the limitations provisions of 28 U.S.C. § 2244(d)(1) to prevent a fundamental miscarriage of justice" (citing McQuiggin v. Perkins, 569 U.S. ___, 133 S. Ct. 1924 (2013))).)[7] Thus, to the extent Petitioner ever asserted an argument that subparagraph (D) rendered the Petition timely, he has waived any such position by ignoring the issue in responding to Respondent's detailed challenge to that timeliness theory in the Motion to Dismiss. See, e.g.,

---

[6] As detailed in Section I, Petitioner did not file his MAR until March 7, 2013. State collateral filings made after the expiration of the federal limitations period do not affect the timeliness analysis. See Minter v. Beck, 230 F.3d 663, 665 (4th Cir. 2000).

[7] The Petition also asserts in conclusory fashion that "Petitioner is actually innocent of the charges for which he was convicted." (Docket Entry 1, ¶ 18.)

Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 152 n.4 (4th Cir. 2012) ("This issue is waived because [the plaintiff] fails to develop this argument to any extent in its brief ."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.") Nickelson v. Astrue, No. 1:07CV783, 2009 WL 2243626, at *2 n.1 (M.D.N.C. July 27, 2009) (unpublished) (Dixon, M.J.) ("[A]s [the plaintiff] failed to develop these arguments in his Brief, the court will not address them.").

Turning to Petitioner's actual innocence argument, the United States Supreme Court has recognized that a showing of actual innocence may excuse noncompliance with the one-year limitations period. McQuiggin, 569 U.S. at ___, 133 S. Ct. at 1928. However, the Supreme Court also ruled that showings of actual innocence "are rare," and that a petitioner must demonstrate that no reasonable juror could vote to find the petitioner guilty beyond a reasonable doubt. Id.; see also United States v. Jones, 758 F.3d 579, 583 (4th Cir. 2014) (noting that "substantial claim[s] of actual innocence are extremely rare" (quoting Schlup v. Delo, 513 U.S. 298, 321 (1995))). Moreover, "'[a]ctual innocence' means factual

innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324. The reviewing court must consider "all of the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." <u>House v. Bell</u>, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). For the reasons that follow, Petitioner has not satisfied that stringent standard.

Petitioner bases his actual innocence argument on "over 1,000 pages of police reports, SBI Lab reports, photographs, videos, and diagrams, plus [an] additional 18 recorded witness interviews . . . not revealed to the trial jury, [that allegedly] contradict the story presented by the State." (Docket Entry 11 at 2-3.) That evidence includes:

- police and SBI reports regarding two shell casings allegedly found on the porch of the drink house

- inconsistent descriptions of the shooter in the transcribed statement of and police reports regarding witness Cynthia Coleman

- impeachment evidence against the two identifying witnesses, Mary Geter and Anita Jeter

- statements of ten witnesses, including Evans, that identify shooters other than Petitioner

(Id. at 4-6.)   According to Petitioner, the Court must evaluate that evidence in the context of "evidence not presented in th[e] case.  No murder weapon was ever recovered.  No forensic evidence tied [Petitioner] to the crime (no [finger]prints or DNA).  There was no confession or admissions by [Petitioner], who to this day maintains his innocence.  There was no evidence of motive by [Petitioner]."  (Id. at 6.)

In reply, Respondent contends that Petitioner's actual innocence argument "[c]omes [t]oo [l]ate" (Docket Entry 17 at 2), and relies upon evidence that qualifies as neither "[r]eliable [n]or [t]rustworthy" (id. at 3).  Further, Respondent points out that "Petitioner presents this Court with the same evidence and arguments presented to the MAR court in support of his Brady and Napue claims."  (Id.)  Thus, Respondent argues that, "[a]ffording the MAR court's factual findings § 2254(e)(1) deference, if Petitioner's showing to the MAR court did not 'undermine the confidence in the verdict,' then it cannot meet the weightier Schlup standard."  (Id. at 3-4 (quoting Docket Entry 7-14 at 3).)

## A. Timing of Actual Innocence Argument

In Schlup, the United States Supreme Court instructed that district courts "may consider how the timing of the [new evidence submitted in support of an actual innocence argument] . . . bear[s] on the probable reliability of that evidence."  Schlup, 513 U.S. at

332; see also McQuiggin, 569 U.S. at ___, 133 S. Ct. at 1935 (holding that "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" under Schlup, and that "[c]onsidering a petitioner's diligence, not discretely, but as part of the assessment whether actual innocence has been convincingly shown, attends to the State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new evidence"). In other words, "a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." McQuiggin, 596 U.S. at ___, 133 S. Ct. at 1928.

Here, the timing of Petitioner's actual innocence argument significantly decreases its reliability. As succinctly put by Respondent:

> Petitioner has never before claimed actual innocence. During the original investigation, he refused to speak with investigators. ([Docket Entry 7-13 at 127.]) Petitioner declined to testify at trial. ([Docket Entry 7-3 at 148-49, 156.]) Petitioner did not claim actual innocence in either his state post-conviction [MAR] or his [AMAR], nor did he support either filing with [an] affidavit of actual innocence. ([Docket Entry 7-9 at 13; Docket Entry 7-11 at 21] (attorney's verification of **his** belief there was a good faith basis for Petitioner's claims – actual innocence not among them)[.]) Petitioner did not testify at the AMAR hearing. ([Docket Entry 7-12 at 2, 110.]) While Petitioner verified his habeas application, the claim of actual innocence was conclusory and included **no** facts in support. ([Docket Entry 1 at 14, 16.])

14

(Docket Entry 17 at 2-3 (emphasis in original).) Petitioner possessed awareness of his alleged actual innocence since his arrest and indictment in late 1993 and yet, inexplicably, he waited over two decades to assert that innocence. Petitioner's substantial delay in raising the issue of alleged actual innocence weighs strongly against its reliability.

## B. Reliability and Trustworthiness of New Evidence

Respondent maintains that "Petitioner's 'new evidence' is neither reliable nor trustworthy." (Docket Entry 17 at 3 (initial capital letters and bold font omitted).) "To be credible," a <u>Schlup</u> actual innocence claim "requires petitioner to support his allegations of constitutional error with new <u>reliable</u> evidence — whether it be exculpatory scientific evidence, <u>trustworthy</u> eyewitness accounts, or critical physical evidence — that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324 (emphasis added). Most of Petitioner's new evidence, however, does not qualify as reliable or trustworthy.

Petitioner supports his actual innocence argument, in large part, with witness statements memorialized in police reports and transcripts of witness statements provided to law enforcement during the investigation of the murders. (<u>See</u> Docket Entry 11 at 6, 13-23.) However, those statements lack sufficient indicia of reliability to support a gateway claim of actual innocence. As Respondent argues (<u>see</u> Docket Entry 17 at 3), the statements do not

15

reflect oaths, affirmations, or verifications (see Docket Entry 7-13; see also Docket Entries 10-1 through 10-6) and all but the statement of Avlon Fryer (Docket Entry 10-3), which she later recanted after failing a polygraph examination (see id. at 14, 19, 21-23), lack even signatures (see Docket Entry 7-13; see also Docket Entries 10-1, 10-2, and 10-4 through 10-6).[8] Moreover, many of the statements contain multiple omissions due to inaudibility. (See Docket Entry 10-1 at 3, 4, 6-19; Docket Entry 10-4 at 4, 6, 8, 10, 12, 13, 15-18, 21-23, 25; Docket Entry 10-5 at 3, 6, 8, 11.)

The two 9mm shell casings allegedly found on the front porch of the drink house fare no better in terms of reliability. The police did not find the casings themselves during their investigation of the crime scene. (See Docket Entry 7-13 at 30.) Rather, a citizen by the name of John Ham approached a law enforcement officer at the scene some time between 9:05 a.m. and 10:01 a.m. with the two casings that Ham claimed to have found on the drink house's porch. (Id.) The record indicates neither when Ham allegedly found the casings, nor where on the porch he allegedly found them. (Id.) Further, police records reflect that a resident of the house two doors down from the drink house, Essie Mae Green, placed a 911 call about the shootings at 3:39 a.m. (see Docket Entry 7-13 at 2), and that the police arrived on the scene

---

[8] Indeed, Fryer later recanted her story that she saw two men named "Demo" and "Sunshine" shoot the victims, and admitted that she had been at home asleep at the time of the shootings. (Compare Docket Entry at 10-3 at 5-13, with id. at 21-23.)

and began establishing a perimeter just minutes later at 3:42 a.m. (<u>See</u> Docket Entry 7-13 at 3-5.) No explanation exists in the record to account for the five to six hour time lapse between the police's arrival on the scene and Ham's decision to turn the casings over to police. In addition, the record does not reveal a reason for Ham's presence at the scene (i.e., as a partygoer, a curious onlooker, an innocent bystander, etc.), whether Ham, who did not reside on East 22nd Street (the street of the drink house) (<u>see</u> Docket Entry 7-13 at 30), had been present at the drink house during the shootings, or knew any of the individuals at the drink house that evening. Those facts also call into question Ham's motives for disturbing the crime scene rather than leaving the casings for the police to collect as evidence. Moreover, Ham died on August 29, 2009 (<u>see</u> Docket Entry 7-12 at 80), and he apparently did not give a statement attesting to the circumstances of his discovery of the casings prior to his death.

Under these circumstances, much of Petitioner's new evidence lacks sufficient reliability to support his actual innocence argument.

## C. The <u>Schlup</u> Standard

Respondent further argues that, even if the Court overlooks Petitioner's delay in raising the issue of actual innocence and the unreliability of some of Petitioner's new evidence, his actual innocence argument still fails. (<u>See</u> Docket Entry 17 at 3-15.) In

support of that position, Respondent "submits a number of screen shots from [the crime scene video taken by law enforcement] . . . [to] illustrate Respondent's points." (Docket Entry 17 at 5; <u>see also</u> Docket Entry 17-1 at 2-11.)[9] According to Respondent, "[w]hen Petitioner's 'new evidence' is considered alongside what the jury knew, it is manifest that no reasonable juror would have a reasonable doubt of Petitioner's guilt." (Docket Entry 17 at 9.)

**1. The Two 9mm Shell Casings Found on the Front Porch**

According to Petitioner, the state "cover[ed]-up" the existence of the two 9mm shell casings allegedly found by Ham on the drink house's front porch. (Docket Entry 11 at 12.) In support of that assertion, Petitioner maintains that two detectives testified untruthfully at Petitioner's criminal trial when they each denied that they had found any shell casings on the drink house's front porch. (<u>See</u> Docket Entry 11 at 10; <u>see also</u> Docket Entry 7-3 at 93, 133.) Petitioner asserts the significance of that "cover-up," because an SBI report reflects that the same weapon fired the 12 9mm shell casings found by law enforcement in the street and on or near the sidewalk by the drink house, as well as the two 9mm shell casings allegedly found by Ham on the drink house's front porch. (<u>See</u> Docket Entry 11 at 10; <u>see also</u> Docket

---

[9] The Court may consider Respondent's new evidence, as the actual innocence inquiry considers "all evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." <u>House</u>, 547 U.S. at 538 (internal quotation marks omitted).

Entry 7-14 at 2-12.)  Thus, Petitioner contends that, if he had fired shots from next to a blue car parked in the street in front of the drink house, as witnesses Geter and Jeter had testified (see Docket Entry 7-3 at 31-38, 53-59), casings from his weapon could not have landed on the drink house's front porch.  (See Docket Entry 11 at 10.)  Petitioner further maintains that the "cover-up . . . was further compounded by the State when it hid the fact that the third eyewitness, Cynthia Coleman, described the shooter [in her August 10, 1993 transcribed statement] as initially firing from or just off the porch of the drink house."  (Id. at 12; see also Docket Entry 7-11 at 48.)

Assuming that Ham's alleged discovery of the two casings on the front porch constituted reliable new evidence, Petitioner's arguments miss the mark.  As an initial matter, Petitioner's claim of a "cover-up" by the state falls short.  As Respondent observes, "[t]he question posed to both officers was 'did you [the police] find any shell casings on the porch,' and the answer was 'No, we did not.'" (Docket Entry 17 at 11 (emphasis added) (quoting docket Entry 7-3 at 98, 137).)  As neither those officers, nor any other law enforcement officer, themselves found shell casings on the drink house's front porch, their testimony does not qualify as untruthful, particularly given that nothing in the record establishes either officer's knowledge of the one-page report documenting Ham's encounter with another law enforcement officer

19

(see Docket Entry 7-14 at 30). Moreover, the state sent the two casings allegedly found by Ham to the SBI for testing (see Docket Entry 7-14 at 2-12), which generated discoverable material, see N.C. Gen. Stat. § 15A-903(d), (e) (1994), thus belying Petitioner's charge of a "cover-up" (Docket Entry 11 at 12).

Setting aside Petitioner's allegations of a "cover-up" (id.), the existence of the two casings Ham allegedly found on the porch does not discredit the testimony of Geter and Jeter regarding the location of the shooter. The MAR court recognized (and Petitioner's counsel conceded), that "most 9-millimeters . . . eject [their shell casings] upward and to the right" (Docket Entry 7-12 at 165), and that the casings can "bounce every which way" (id. at 166). Thus, given the relatively short distance between the curb in front of the drink house where witnesses placed Petitioner while shooting and the front porch of the drink house (see Docket Entry 17-1 at 2-4, 10, 11 (depicting, visually, that distance)), the casings Ham allegedly found on the front porch could have arrived there when Petitioner fired from his location by the curb.

Petitioner also emphasizes that "the State . . . hid the fact that the third eyewitness, Cynthia Coleman . . . said the shooter at first shot from the porch, where [two] shell casings were found, and then from near the car, where 12 casings were found." (Docket Entry 11 at 12; see also Docket Entry 7-11 at 48.) According to

Petitioner, Coleman's testimony about the initial shots from the porch, along with the Ham's alleged discovery of two shell casings on that porch, "severely impeache[s]" the testimony "of Geter and Jeter – the only two witnesses to connect [Petitioner] to the crimes." (Id.) However, Coleman never stated that the same individual shot from the porch up into the air and then later from the car at the curb (see Docket Entry 7-11 at 48-49, 51-53), and other witnesses identified in their transcribed statements individuals other than Petitioner who shot guns into the air on the porch to break up an argument (see Docket Entry 10-1 at 7; Docket Entry 10-4 at 9; Docket Entry 10-5 at 7). Thus, Coleman's statement does not exculpate Petitioner.

**2. Witness Coleman's Statements to Police**

Next, Petitioner faults the state for "not reveal[ing] to the jury what Cynthia Coleman actually described in her recorded statement." (Docket Entry 11 at 14.) In particular, Petitioner argues that the state suppressed Coleman's statements (1) regarding a group of males walking away from the drink house and going after someone with a glass bottle (id. at 15 (citing Docket Entry 7-11 at 49)); and (2) describing the shooter as having dreadlocks or plats in his hair, as between 5'5" to 5'8" tall, and as wearing jeans and a striped and/or dark colored shirt (id. (citing Docket Entry 7-11 at 41, 44, 52)). Petitioner maintains that he measures 6 feet tall, points to three photographs attached to his AMAR which

purport to establish that he wore his hair in a short afro at the time of the murders, and notes Coleman's trial testimony that the shooter wore "a light colored [t]-shirt and maybe dark clothes at the bottom" (Docket Entry 7-3 at 77).  (Docket Entry 11 at 15-16.)

None of these statements by Coleman exculpate Petitioner. Coleman's statement about the group with the glass bottle does not exculpate Petitioner, as Coleman stated neither that Petitioner formed a part of that group, nor that anyone in the group shot a gun.  (See Docket Entry 7-11 at 49.)  With regard to Petitioner's hair, the photographs Petitioner submitted with his AMAR do not establish his hairstyle on July 25, 1993, the date of the murders. The first photograph, a mugshot dated September 11, 1993, showing Petitioner with short hair, does not aid his cause, because Petitioner could have changed his appearance after the murders but before his arrest.  (See Docket Entry 7-11 at 30.)  The second photograph purports to depict Petitioner, with short hair, in the summer of 1993, but the picture itself bears no date, and Petitioner has introduced no testimony or affidavits substantiating the date of the photograph.  (See id. at 31.)  The third photograph, a mugshot dated December 24, 1990, showing Petitioner with short hair, predates the murders by over two and a half years, which constitutes sufficient time for Petitioner to have significantly changed his hairstyle before the murders.  (See id. at 32.)  Moreover, discrepancies between Coleman's initial

recollection and trial testimony regarding the shooter's clothing, and her apparent error in assessing the shooter's height, do not support Petitioner's actual innocence claim. Coleman testified that she did not know Petitioner (see Docket Entry 7-3 at 78, 85, 87), and did not identify Petitioner at trial (see generally id. at 65-88). Given those circumstances, Petitioner cannot show that the jury would have rejected Coleman's testimony about the sequence of events, the shooter's location and actions, and the description of the car in which the shooter left the scene.

### 3. Impeachment Evidence Regarding Witnesses Geter and Jeter

Petitioner also accuses the state of suppressing "significant impeachment evidence against the two key witnesses at trial, Geter and Jeter." (Docket Entry 11 at 17.) In particular, Petitioner asserts that the state failed to disclose that (1) Jeter told investigators that she worked part-time at the drink house serving drinks to customers (Docket Entry 11 at 17 (citing Docket Entry 7-11 at 85)); and (2) Geter and Jeter both told the police that Petitioner had fired a "large caliber semi-automatic handgun that was dark in color" (id. at 18 (citing Docket Entry 7-11 at 85, 88)). Petitioner points out that these statements to police conflict with Jeter's testimony at trial that she only knew of the drink house through word of mouth and had never worked there (see Docket Entry 7-3 at 55-56), both witness's trial testimony that they did not know the difference between a revolver and an

automatic (see id. at 34, 55), Jeter's testimony that she did not notice anything in particular about the shooter's gun (see id. at 54-55), and the medical examiner's testimony that medium caliber bullets killed both murder victims (see id. at 121). According to Petitioner, "disclosure of [Jeter's] misrepresentation to the jury [about her employment at the drink house] would have cast serious doubt on her credibility, as it could have been argued that she was protecting or covering up for the real shooter, or that she was testifying in return for a deal – i.e., it is a crime to sell alcohol without a license, and she was not charged." (Docket Entry 11 at 18.) Further, Petitioner contends that suppressing the witness's statements to police that the shooter used a large caliber handgun gave the jury the "false impression" that the witnesses saw Petitioner "shoot down the street with a medium caliber, 9mm handgun, the weapon that murdered the two young men." (Id.)

Petitioner's arguments lack merit. Although disclosing to the jury that Jeter told police that she worked at the drink house might have impeached her credibility on that particular point, such disclosure would not likely have impacted the jurors' assessment of Jeter's testimony about the sequence of events and the identity and location of the shooter, which the testimony of Geter

corroborated.[10] Petitioner's assertion that his defense counsel at trial could have "argued that [Jeter] was protecting or covering up for the real shooter, or that she was testifying in return for a deal" with the prosecution constitutes sheer speculation insufficient to support an actual innocence claim. See O'Boyle v. Ortiz, 242 F. App'x 529, 531 (10th Cir. 2007) (holding that "speculation is insufficient to meet the heavy burden to produce new evidence from which we could conclude it is more likely than not that no reasonable juror would have convicted him"); Gandarela v. Johnson, 286 F.3d 1080, 1086 (9th Cir. 2002) (observing that "speculative and collateral impeachment falls far short of showing actual innocence"). Moreover, non-disclosure of statements to police that the shooter used a large caliber handgun could not have given the jury a "false impression" that the witnesses saw Petitioner "shoot down the street with a medium caliber, 9mm handgun" (see Docket Entry 11 at 18), as the jury heard both witnesses testify that they could not describe the shooter's gun (other than Geter's recollection that the gun had "clips in it" (see Docket Entry 7-3 at 34)) and did not know the difference between a revolver and an automatic (see Docket Entry 7-3 at 34, 54-55).

---

[10] Jeter testified that she had known Petitioner for more than two years prior to the incident. (See Docket Entry 7-3 at 50.)

## 4. Witness Statements Regarding Shooters Other Than Petitioner

Petitioner next relies on the statements of ten witnesses who "identified the shooter as someone other than [Petitioner]." (Docket Entry 11 at 19.) Petitioner contends the state's non-disclosure of those statements "created a false impression that *only* [Petitioner] was shooting in the direction of the two young men who were killed." (Id. (bold font omitted).) In that regard, Petitioner relies on the following witness statements not disclosed by the state:

- Evans told police he had heard from others at the scene that a man named Grant shot him (see Docket Entry 7-13 at 68, 69), and that, although he did not see who shot him in the foot, he saw a person standing behind a white Cavalier across from the drink house firing a handgun (see Docket Entry 7-11 at 62-81);[11]

- Haushen Lionell Lindsey told police Grant Mobley shot Evans because Grant had "beef" with Evans over money (Docket Entry 10-1 at 17), and that Grant asked Dedrick Crump who else he had beef with before murder victim Waddell Lynn Bitting got shot (see id. at 14);

- Josephine Latrice McGill told police that Grant and Darrell were shooting from a white car at the time that two of the victims got shot (see Docket Entry 10-2 at 5-7);

---

[11] Petitioner distorts Evans's statements to suggest that he reportedly "saw a shooter firing a handgun in the direction of the two men that were killed." (Docket Entry 11 at 22 (citing Docket Entry 7-11 at 12-81 (emphasis added)).) In actuality, Evans stated that he saw an individual shooting in the air near [U.S. Highway 52] six time[s] [from] behind . . . [a] white Cavalier." (Docket Entry 7-11 at 62 (emphasis added); see id. at 70 (reflecting Evans's statement that "some dude . . . was on the side of a white Caviler [and] started shooting up in the air" from the "turn around spot" on East 22nd Street) (emphasis added).)

- Fryer told police that men named Demo and Sunshine shot the two murder victims (see Docket Entry 10-3 at 5-13);

- An anonymous tip to Crimestoppers indicated that Demo and Sunshine shot the two murder victims (see Docket Entry 10-6 at 2);

- Donnell Ray Garner told police Sunshine and a "big, fat boy" participated as shooters (Docket Entry 10-5 at 13);

- Shanta Levette Smith identified Fat Cat as a shooter (see Docket Entry 7-13 at 37);

- Teresa Smith identified Fat Cat and Rob White as shooters (see Docket Entry 7-13 at 38);[12]

- Michael Tolliver observed Rob White and Valmark Cuthrell shooting into the crowd (see Docket Entry 10-4 at 23);[13] and

- Another anonymous caller to Crimestoppers claimed that Petitioner did not shoot the victims, and implicated Fat Cat and Rob as the shooters (see Docket Entry 10-8 at 2).

(See Docket Entry 11 at 19-23.)

Petitioner's contentions regarding these witness statements fail to support his actual innocence claim. The only two statements exonerating Petitioner do not constitute reliable evidence. Fryer recanted in full her statement that Demo and

---

[12] Although Petitioner maintains that Teresa Smith also implicated Valmark Cuthrell as a shooter (see Docket Entry 11 at 21 (citing Docket Entry 7-13 at 37-38)), that statement does not exist on the pages cited by Petitioner (see Docket Entry 7-13 at 37-38).

[13] Petitioner maintains that Tolliver specifically recalled White and Cuthrell firing their guns "into the crowd" (Docket Entry 11 at 21); however, Tolliver's statement indicates that White and Cuthrell shot into the air, toward the street, and "everywhere" (Docket Entry 10-4 at 21), but does not specify that White and Cuthrell targeted the crowd.

Sunshine killed the two murder victims over money (see Docket Entry 10-3 at 14-23), and admitted that she made the anonymous call to Crimestoppers on August 2, 1993, implicating Demo and Sunshine as the murderers (see Docket Entry 10-6 at 2). The other exonerating witness called Crimestoppers anonymously (see Docket Entry 10-8 at 2), and the record does not indicate that police ever determined the identity of that caller or the veracity of the report.

Furthermore, none of the other witness statements exonerates Petitioner. <u>Critically, not one of those witnesses saw anyone shoot the two murder victims</u>. Moreover, the fact that these witnesses observed (and/or even identified) other shooters in the vicinity of the drink house would have had little impact on the jury, given that the jury already heard testimony from (1) Geter and Jeter describing at least one other shooter than Petitioner (see Docket Entry 7-3 at 28-30, 51-53 (testimony indicating that they each heard gunshots outside of the drink house while Petitioner remained in their presence)); (2) Coleman describing multiple individuals shooting from different locations and in different directions, and indicating that she heard up to fifty gunshots, which continued even after Petitioner drove away from the scene and after law enforcement had arrived (see Docket Entry 7-3 at 73-88); and (3) law enforcement officers at the scene describing shell casings of differing calibers and in various locations on the sidewalk and street, and bullet holes in the columns and roof of

the front porch (see id. at 96-104, 137).  See Clark v. Clarke, No. 7:14CV00042, 2017 WL 819500, at *8 (W.D. Va. Mar. 1, 2017) (unpublished) (holding that, "even with some uncertainty as to the precise identities of the shooters, legal insufficiency is not enough to prove actual innocence under Schlup"); Ros v. Ducart, No. 1:15-CV-01050-JLT, 2015 WL 4478128, at *5 (E.D. Cal. July 22, 2015) (unpublished) ("[W]hile the declaration contains [the witness's] recollections and impressions of the chaotic scene the night of the crimes, it does not, by itself establish innocence nor does it seriously undermine the prosecution's case.  Had he been called at trial, the jury would have been instructed to weigh [the witness's] credibility against that of the other eyewitnesses and to accept or reject some or all of [the witness's] testimony regarding [the petitioner's] involvement in the crime.").

After consideration of "all of the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial," House, 547 U.S. at 538 (internal quotation marks omitted), Petitioner has not demonstrated that "no reasonable juror would have found [him] guilty beyond a reasonable doubt," Schlup, 513 U.S. at 327.

Accordingly, the statute of limitations bars the instant Petition.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 6) be granted, that the Petition (Docket Entry 1) be dismissed, and that a judgment be entered dismissing this action, without issuance of a certificate of appealability.

                                         /s/ L. Patrick Auld
                                             **L. Patrick Auld**
                             **United States Magistrate Judge**

July 3, 2017